******************************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# KENNETH L. THOMAS *v.* MEGHAN M. CLEARY
## (AC 46365)

Alvord, Suarez and Westbrook, Js.

*Syllabus*

The defendant appealed from the trial court's judgment adjudicating several postjudgment motions in the underlying custody action involving the parties' minor children. On appeal, the defendant claimed, inter alia, that the court improperly granted the plaintiff's postjudgment motion for the modification of custody. *Held*:

This court declined to consider the propriety of certain factual findings made in connection with the trial court's earlier judgment because the defendant's challenge to those findings amounted to an impermissible collateral attack on the prior judgment.

The trial court's finding that the defendant had made another false accusation of abuse against the plaintiff was supported by abundant evidence and, thus, was not clearly erroneous.

The trial court did not abuse its discretion in granting the plaintiff's motion for modification because the court's factual findings supported a determination that there was a material change in circumstances and that it was in the best interests of the parties' children to grant the motion.

This court declined to review the defendant's inadequately briefed claim that the trial court improperly denied her motion to disqualify the judicial authority.

Submitted on briefs May 29—officially released November 5, 2024

*Procedural History*

Application for custody of the parties' minor children, and for other relief, brought to the Superior Court in the judicial district of Ansonia-Milford, and transferred to the judicial district of New Haven, where the case was tried to the court, *Grossman, J.*; judgment granting joint legal custody of the minor children to the parties and primary physical custody to the plaintiff; thereafter, the plaintiff and the defendant each filed a motion for modification of custody; subsequently, the court, *Hon.*

*James G. Kenefick*, judge trial referee, denied the defendant's motion to disqualify the judicial authority, *Grossman, J.*; thereafter, *Grossman, J.*, rendered judgment granting the plaintiff's motion to modify custody and denying the defendant's motion to modify custody, from which the defendant appealed to this court. *Affirmed.*

*Meghan M. Cleary*, self-represented, filed a brief as the appellant (defendant).

*John J. Mager* filed a brief for the appellee (plaintiff).

*Opinion*

SUAREZ, J. In this custody matter, the self-represented defendant, Meghan M. Cleary, appeals from the judgment of the trial court adjudicating several postjudgment motions.[1] On appeal, the defendant claims that the court improperly (1) granted a postjudgment motion for modification of custody brought by the plaintiff, Kenneth L. Thomas, (2) "displayed consistent bias" against her, and (3) found that she had an imputed earning capacity of $90,000.[2] We affirm the judgment of the trial court.

---

[1] During the initial custody action, the defendant was represented by counsel. The defendant has represented herself in connection with all postjudgment motions. The plaintiff, Kenneth L. Thomas, has been represented by counsel in all proceedings in this matter. A guardian ad litem has been appointed to represent the interests of the children throughout this litigation.

[2] In the statement of issues in her appellate brief, the defendant characterizes her claims of error as follows: "(1) Whether custody and visitation rulings with no support of any kind in the trial record require reversal. . . . (2) Whether financial rulings in a domestic relations case, with no support of any kind in the trial record, require reversal. . . . (3) Whether reversal is required when the trial court systematically ignores all evidence favorable to one party, no matter how credible. . . . (4) Whether reversal is required by the trial court's manifest bias against the [defendant]. . . . (5) Whether a trial court may use child custody/visitation as a means to 'punish' a litigant rather than determining these issues on the basis of the children's best interest." We have reframed the defendant's claims, in some instances condensing closely related claims, to more accurately reflect the arguments in her brief. See, e.g., *Doe* v. *Quinnipiac University*, 218 Conn. App. 170, 173 n.4, 291 A.3d 153 (2023).

The following facts and procedural history are relevant to the resolution of this appeal. The plaintiff and the defendant are the parents of three minor children. The plaintiff first initiated a custody action in 2019. On July 25, 2022, after a fully contested hearing, the court, *Grossman, J.*, made the following oral findings regarding the defendant: "[V]arious professionals have expressed concern with the [defendant's] ability to address the children's emotional needs appropriately. . . . [They] reported that the [defendant] appeared disconnected from the children at times, unable to respond to them or redirect them appropriately. . . . Those same individuals noted examples of the [defendant] repeatedly taking a small, otherwise normal or not especially concerning behavior by the children or a child and misreading it and creating a bigger, alarming meaning to that behavior. This tendency led the [defendant] to claim that the [plaintiff] was molesting the children, taking pornographic pictures of the children, and using drugs when it turns out that none of these things were true. This tendency by the [defendant] is well documented and it is harmful for the children. These events are exaggerated and they are inaccurate. They distract the [defendant] from focusing on what the children actually need in the moment. They also caused her to have the children examined and interviewed and separated from [the plaintiff] for long periods of time. . . .

"The [defendant] has repeatedly and falsely accused the [plaintiff] of sexually molesting the children. She withheld the children from him on this basis for six months. The police, the Department of Children and Families [(DCF)], [various professionals evaluating the children in clinical settings], and the [guardian ad litem (GAL)] determined that these allegations were not true. However, even in her testimony the [defendant] was unable to satisfactorily explain these events to the

court. She indicated no understanding, to this court or to anyone else that this court heard from, about the negative impact this behavior had on her children. Her historical willingness to cut the children off from their father is troubling. . . .

"An especially important . . . item or statutory criteria for [custody] decision[s] is the mental and physical health of all the individuals involved. . . . [T]he [defendant's] mental health has been an area of concern throughout this case. Such an area of concern that she submitted to a psychological evaluation . . . . [The evaluator's] report codifies what the [GAL] and other engaged professionals and the court observed about the [defendant] and that is that her demeanor can be quite unusual. She is sometimes emotionally elevated; sometimes grandiose. She's highly reactive. Her thinking is sometimes tangential. Her thought processes were difficult to follow. This court struggled to understand some of her testimony because the connections between her ideas were so tenuous. . . .

"The [defendant's] history of substance abuse is also relevant for this custody determination. And this is a concern raised by many professionals throughout the history of this case . . . . I don't think that [the evaluator] made this question, but the other professionals did, questioned whether or not the [defendant] was actually under the influence of medication or drugs on the occasions when they saw her. . . . There is good reason for this concern. The [defendant] was arrested in September, 2019, on several counts of larceny and possession of controlled substances. These charges relate to accusations that she was in possession of opiates prescribed to patients at the nursing home where she worked. These charges are still pending. She tested positive for opiates and cocaine in September of 2019. She is presently enrolled in and compliant with a five year program called the HAVEN program, which stands

for the Health Assistance Intervention Education Network, though the Department of Public Health. . . . [A]s part of her participation in this program, the [defendant] is drug tested and attends eight [Narcotics Anonymous] meetings per month. She told the court that she used the same five year program in 2010 incident to similar criminal charges. Despite these two arrests [and] the positive drug tests . . . the [defendant] denied to the court that she has a drug problem. She blames others, including the [plaintiff] and his father, for the criminal charges. And she says that any inconclusive drug tests at the HAVEN were a result of her . . . diabetes treatment. This testimony is simply not credible.

\* \* \*

"The evidence before this court indicated strongly that the [defendant] has untreated mental health and substance abuse issues. Despite this evidence, the [plaintiff] and the [GAL] have requested the court to order joint legal custody and a shared parenting plan. This—this court is going to grant that request, but future modifications should take into account the court's observations about the needs of the [defendant] for additional treatment."

On the basis of these facts, the court issued the following orders: "The parties will share joint legal custody. In the event of a dispute, and after consultation and discussion with the [defendant], the [plaintiff] may make a final decision in all issues regarding the children. . . . The children will reside primarily with [the plaintiff]. If he deems it appropriate, he may change the school district the children attend."[3]

---

[3] The defendant appealed from the July 25, 2022 judgment. On November 21, 2022, that appeal was dismissed due to the defendant's failure to submit certain preliminary documents. On December 5, 2022, the defendant filed a motion to reconsider the dismissal. On March 27, 2023, this court dismissed the defendant's motion to reconsider as moot, as subsequent custody orders had superseded the July 25, 2022 judgment and, thus, the court could not offer the defendant any practical relief.

On August 29, 2022, the defendant refused to return the children to the plaintiff at the end of her scheduled parenting time, in order for the children to attend their first day of school in a new school district selected by the plaintiff. As a result, on the same day, the plaintiff filed an application for an emergency ex parte order of custody and a postjudgment motion for modification of custody. In an affidavit in support of his August 29, 2022 ex parte application, the plaintiff averred that, pursuant to the July 25, 2022 custody order, the defendant was supposed to bring the children to school on the morning of August 29, 2022, but failed to do so. The court, *Price-Boreland, J.*, denied the plaintiff's emergency ex parte application but issued an order that the defendant return the children to the plaintiff "immediately" and scheduled an expedited hearing on the application.

On September 9, 2022, the court, *Grossman, J.*, commenced a hearing on the plaintiff's August 29, 2022 ex parte application. At the conclusion of the first day of evidence, the court issued the following temporary orders: "The [plaintiff] will have sole legal and physical custody of the minor children. . . . The children will be in the physical custody of the [plaintiff] at all times but for every Saturday from noon to Sunday at 5 p.m. . . . The [plaintiff] has sole decision-making authority regarding the education of the children, including decisions regarding their transportation to and from school." The hearing continued on October 3 and November 4, 2022.

On November 8, 2022, the court issued the following written orders: "The [plaintiff] has sole physical and legal custody of the minor children. . . . The [defendant's] parenting time will be [1] Every other weekend from after school on Friday to Sunday at 5 p.m. [2] Every week on Wednesdays from after school to 7 p.m. . . . The parents will have reasonable phone and/or

video call access with the children when they are not in their care. . . . The [defendant] may not interfere with the children's school, activities and transportation to and from school.''

On November 14, 2022, the defendant filed an application for an emergency ex parte order of custody and a postjudgment motion for modification. In support of her application, the defendant once again alleged that the plaintiff had been sexually abusing the children. The court denied the ex parte application the same day. On November 15, 2022, the plaintiff filed a new application for an emergency ex parte order of custody and a postjudgment motion for modification. In an affidavit in support of this ex parte application, the plaintiff averred that, on November 13, 2022, the Orange Police Department and DCF informed him that the defendant once again had alleged that he had sexually assaulted one or more of the children. The plaintiff's application for an ex parte order of custody was granted the same day, and the court issued temporary orders suspending the defendant's visitation unless clinically supervised.

A consolidated hearing on the parties' ex parte applications and motions for modification of custody was scheduled for November 29, 2022. On November 28, 2022, the defendant filed a motion for the disqualification of Judge Grossman. In her motion, the defendant alleged that Judge Grossman was biased and prejudiced against her. The motion to disqualify was referred to the court, *Hon. James G. Kenefick, Jr.*, judge trial referee, and a hearing on that motion was held on December 22, 2022. In its memorandum of decision dated January 3, 2023, the court denied the motion.

A fully contested hearing on the parties' ex parte applications and motions for modification of custody was held on January 6, 2023. In a memorandum of decision dated March 13, 2023, the court, *Grossman,*

*J.*, made the following factual findings: The defendant has "initiated new investigations into the [plaintiff]. She accused him, again, of sexually abusing the children. As in the past, she withheld the children from [the plaintiff] and subjected them to interviews and invasive evaluations. [DCF] and the Orange Police Department were compelled to investigate this complaint, as they have on many prior occasions. They quickly closed their investigations, concluding that the complaint was unfounded.

"At the time of the hearing, the children had not seen [the defendant] in six weeks. On November 15, 2022, the GAL recommended, and the court ordered, that contact take place in a supervised clinical setting. This was intended as a temporary order until the [defendant] complied with a full psychological assessment and treatment. The GAL immediately identified a suitable provider for these services. The [plaintiff] consented to this person. The defendant had not, as of January 6, 2023, contacted this provider. . . . The [defendant] refuses to contact this provider because she believes that using a paid provider for this purpose would make her ineligible for her HUSKY medical coverage. No credible evidence was offered in support of this assertion. However, the GAL offered multiple solutions to this stalemate, and the court solicited suggestions from the [defendant]. The [defendant] rejected the GAL's suggestions and offered no [alternatives] to the court.

"The [defendant] has a substance abuse disorder. The [plaintiff] and the GAL are concerned she may have relapsed. Her criminal charges from 2019 are not resolved. She was admitted into a diversionary program for the drug charges but still faces the related larceny charge. She is enrolled in a five year HAVEN program . . . . This is the second time she has utilized this program to keep her nursing license. HAVEN provides alternatives to discipline for healthcare workers with

physical, mental, emotional or addiction issues. As part of her participation, she is drug tested and attends eight Narcotics Anonymous meetings per month. She told the court she is compliant with this program and the conditions of release set by the criminal court; however, she declined to give the GAL access to her drug testing records.

"The [defendant's] presentation and demeanor in court was concerning. She appeared disassociated from the events taking place; her responses were inconsistent with the courtroom discussions. Her mood fluctuated throughout the hearing from disinterested to angry and agitated. At times it appeared she could not differentiate between her fears and actual events. At the outset of the hearing, she told the court that the ex parte orders should not be extended and that she had evidence to offer as a basis for that assertion. However, when the time came to offer her evidence, she initially refused. When she did testify, it was inconsistent with testimony she offered previously, particularly about . . . how [DCF] was notified of her most recent allegations of sexual abuse by the [plaintiff] and her efforts to find work. She did not appear to recognize these inconsistencies. Her explanations for refusing the GAL access to her drug tests and refusing to engage in a psychological evaluation were difficult to follow and unconvincing. The court could not rely on her testimony.

"The [defendant's] actions over the last six months have negatively impacted the children. Their education was disrupted: they were deprived of their first day of school experience and missed several days after that. The stability of their day-to-day routine was upended. Their relationship with [the plaintiff] was interrupted for two weeks during the latest DCF investigation; he had to leave the home, and the paternal grandparents moved into the home to care for [the] children. Their

relationship with the [defendant] remains interrupted as she refuses to participate in evaluation, treatment or the current access schedule.

"Notwithstanding these events, all parties agree that the children should have contact with [the defendant]. They are bonded to her and benefit from their time with her, but only when she is able to parent them appropriately. The evidence indicates that she cannot do so at this time. She appears to be struggling with her mental health or her drug [addiction] or both."

On the basis of these findings, the court denied the defendant's November 14, 2022 motion for modification of custody, granted the plaintiff's November 15, 2022 motion for modification of custody, and issued the following orders: "The [plaintiff] has sole physical and legal custody of the minor children. . . . The [defendant] will see the children in a therapeutic setting with the individual recommended by the GAL . . . or another agreed upon individual recommended by the GAL. . . . Any additional parenting time with the [defendant] will be by agreement of the parties. The [defendant's] parenting time must be in the presence of an agreed upon third party until the [defendant] demonstrates compliance with the recommendations in [a previous] evaluation," including seeking assessment and treatment for psychiatric disorders, substance abuse issues, or, if necessary, both. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The defendant first claims that the court improperly granted the plaintiff's motion for modification of custody. Specifically, she argues that (1) the "court's rulings on custody and visitation were unsupported by the evidence" in that "there was no competent evidence that [the defendant] made false allegations against [the

plaintiff]" and the "court prejudged the critical issue of [the plaintiff's] alleged sexual abuse," (2) the court's "findings regarding [the defendant's] 'substance abuse problem' were unsupported by any evidence," and (3) the "court's custody related rulings were contrary to the clear weight of evidence." We are not persuaded.

We begin by setting forth the relevant principles of law and our standard of review. General Statutes § 46b-56 bestows upon the trial court the statutory authority to modify an order of custody or visitation. The statute directs the court to "consider the best interests of the child" and, while not requiring the court to assign weight to any of the factors that it considers, sets forth seventeen enumerated factors that the court may consider with respect to the modification.[4] General Statutes § 46b-56 (c).

[4] General Statutes § 46b-56 (c) provides that the court, in making an order for custody, "shall consider the best interests of the child, and in doing so, may consider, but shall not be limited to, one or more of the following factors: (1) The physical and emotional safety of the child; (2) the temperament and developmental needs of the child; (3) the capacity and the disposition of the parents to understand and meet the needs of the child; (4) any relevant and material information obtained from the child, including the informed preferences of the child; (5) the wishes of the child's parents as to custody; (6) the past and current interaction and relationship of the child with each parent, the child's siblings and any other person who may significantly affect the best interests of the child; (7) the willingness and ability of each parent to facilitate and encourage such continuing parent-child relationship between the child and the other parent as is appropriate, including compliance with any court orders; (8) any manipulation by or coercive behavior of the parents in an effort to involve the child in the parents' dispute; (9) the ability of each parent to be actively involved in the life of the child; (10) the child's adjustment to his or her home, school and community environments; (11) the length of time that the child has lived in a stable and satisfactory environment and the desirability of maintaining continuity in such environment, provided the court may consider favorably a parent who voluntarily leaves the child's family home pendente lite in order to alleviate stress in the household; (12) the stability of the child's existing or proposed residences, or both; (13) the mental and physical health of all individuals involved, except that a disability of a proposed custodial parent or other party, in and of itself, shall not be determinative of custody unless the proposed custodial arrangement is not in the best interests of the child;

"Our standard of review of a trial court's decision regarding custody, visitation and relocation orders is one of abuse of discretion. . . . [T]he trial court's decision on the matter of custody is committed to the exercise of its sound discretion and its decision cannot be overridden unless an abuse of that discretion is clear. . . . The controlling principle in a determination respecting custody is that the court shall be guided by the best interests of the child. . . . In determining what is in the best interests of the child, the court is vested with a broad discretion. . . . [T]he authority to exercise the judicial discretion [authorized by § 46b-56] . . . is not conferred [on] this court, but [on] the trial court, and . . . we are not privileged to usurp that authority or to substitute ourselves for the trial court. . . . A mere difference of opinion or judgment cannot justify our intervention. Nothing short of a conviction that the action of the trial court is one [that] discloses a clear abuse of discretion can warrant our interference. . . .

"The trial court has the opportunity to view the parties [firsthand] and is therefore in the best position to assess the circumstances . . . in which such personal factors as the demeanor and attitude of the parties are so significant. . . . [E]very reasonable presumption should be given in favor of the correctness of [the trial court's] action. . . . We are limited in our review to determining whether the trial court abused its broad discretion to award custody based upon the best interests of the child as reasonably supported by the evidence." (Citations omitted; internal quotation marks

(14) the child's cultural background; (15) the effect on the child of the actions of an abuser, if any domestic violence, as defined in section 46b-1, has occurred between the parents or between a parent and another individual or the child; (16) whether the child or a sibling of the child has been abused or neglected, as defined respectively in section 46b-120; and (17) whether the party satisfactorily completed participation in a parenting education program established pursuant to section 46b-69b. The court is not required to assign any weight to any of the factors that it considers, but shall articulate the basis for its decision."

omitted.) *Dolan* v. *Dolan*, 211 Conn. App. 390, 399–400, 272 A.3d 768, cert. denied, 343 Conn. 924, 275 A.3d 626 (2022). In employing our abuse of discretion standard, "[t]he trial court's findings are binding upon this court unless they are clearly erroneous in light of the evidence and the pleadings in the record as a whole. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." (Internal quotation marks omitted.) *Lambert* v. *Donahue*, 78 Conn. App. 493, 498, 827 A.2d 729 (2003).

"Before modifying a custody order, a court must satisfy two requirements. First, modification of a custody award must be based upon either a material change [in] circumstances which alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child. . . . Second, the court shall consider the best interests of the child and in doing so may consider several factors. . . .

"The power of the trial court to modify the existing order does not . . . include the power to retry issues already decided . . . or to allow the parties to use a motion to modify as an appeal. . . . Rather, the trial court's discretion includes only the power to adapt the order to some distinct and definite change in the circumstances or conditions of the parties. . . . [I]ts inquiry is necessarily confined to a comparison between the current conditions and the last court order." (Citations omitted; internal quotation marks omitted.) *J. Y.* v. *M. R.*, 215 Conn. App. 648, 658, 283 A.3d 520 (2022).

A

The defendant first argues that there was no competent evidence to support the court's finding that she

has a history of making false allegations against the plaintiff, including that he sexually abused their children.

Our careful review of the defendant's brief and the record, however, reflects that the factual finding being challenged by the defendant was made in connection with the court's July 25, 2022 judgment.

The defendant's challenge to a finding made in connection with a prior judgment amounts to an impermissible collateral attack on the prior judgment. "Unless a litigant can show an absence of subject matter jurisdiction that makes the prior judgment of a tribunal entirely invalid, he or she must resort to direct proceedings to correct perceived wrongs . . . . A collateral attack on a judgment is a procedurally impermissible substitute for an appeal." (Internal quotation marks omitted.) *Weyher* v. *Weyher*, 164 Conn. App. 734, 746, 138 A.3d 969 (2016). "A collateral attack on a judgment is an attempt to avoid, defeat, or evade it, or deny its force and effect, in some incidental proceeding not provided by law for the express purpose of attacking it. . . . On the other hand, [a] direct attack on a judgment or decree is an attempt, for sufficient cause, to have it annulled, reversed, vacated, corrected, declared void, or enjoined, in a proceeding instituted for that specific purpose, such as an appeal, writ of error, bill of review, or injunction to restrain its execution; distinguished from a collateral attack, which is an attempt to impeach the validity or binding force of the judgment or decree as a side issue or in a proceeding instituted for some other purpose." (Citation omitted; internal quotation marks omitted.) *Lewis* v. *Planning & Zoning Commission*, 49 Conn. App. 684, 688 n.5, 717 A.2d 246 (1998). Accordingly, we decline to consider the propriety of factual findings made in connection with the earlier judgment.

Beyond arguing that the court erred in finding that she had a history of making false accusations against the plaintiff, the defendant also argues that it was clearly erroneous for the court to find that her latest accusation of sexual abuse against the plaintiff was another false allegation. The following additional facts and procedural history are relevant to the resolution of this claim.

As previously mentioned in this opinion, on November 14, 2022, the defendant filed an emergency ex parte application for custody alleging that the children had been sexually abused by the plaintiff. On the same day, the GAL filed a request for an emergency status conference before the court and a hearing was held on November 15, 2022. At that hearing, the GAL informed the court that the purpose of his request was to inform the court of events in the case that were brought to his attention. The GAL reported to the court that, "based on the information that I have received, there was a call made to the Middlebury Police Department by [the defendant] indicating that there was an allegation of sexual abuse on [one of the children] . . . .

"And that led to a DCF referral by the Middlebury [Police Department] to the Careline as well as instructions that the jurisdiction would be the Orange Police Department, not the Middlebury Police Department, as the site of the alleged activity. So a call was also made to the Orange Police Department at that point in time or soon thereafter.

"The Careline did respond on Sunday. And the Careline worker did interview the children at [the defendant's] home. . . .

"The DCF Careline worker then appeared at [the plaintiff's] home later in the day. And [the plaintiff], at that point in time, agreed to a safety plan which included [the plaintiff's] parents being present at all times and him not being able to spend the overnight with his

children. He was also instructed to have [his] parents pick up the children from [the defendant's] home . . . .

"And I have had the opportunity to speak to the DCF supervisor in the Milford office who was the individual who had provided me the information from the notes from the Careline. I also had occasion to speak with the now assigned investigating DCF office who received the case late yesterday. So she will be setting up interviews with the children. This will be the third DCF worker these children have met in the last ninety days because this comes right on the heels of an unsubstantiation from the August referral that happened during the custodial exchange at the end of August. So this would be the third DCF worker.

"I spoke to the investigating detective . . . of the Orange [Police Department] to learn what the status of their investigation was. That has also recently been assigned to [that detective]. [That detective] indicated that she has been in preliminary discussions with DCF. And both DCF and the detective are trying to determine whether or not they will be seeking permission to do yet another forensic evaluation and interview of the minor child . . . .

"[T]he issue or the allegation of digital penetration of the anus has been ongoing since 2019. It has arisen multiple—on multiple occasions. There have been multiple DCF investigations in regards [to] that including the most recent one where the disclosure was from [one of the parties' other children].

"Both boys, at various points in time . . . have gone through forensic interview at Yale. And all of these cases have been unsubstantiated."

On the basis of the GAL's report to the court, the court granted the plaintiff's November 15, 2022 emergency

ex parte application for custody, suspended the defendant's access to the children and scheduled a hearing on the merits of the application for November 29, 2022. The court explained: "I am doing that because the allegations that she's making today are the exact same allegations that were made in the course of the trial, and they were so thoroughly and completely debunked during the course of that trial that the fact that [the defendant] is still latching on to those . . . is just too much for the court to be expected to withstand."

During the January 6, 2023 hearing on the parties' motions for modification of custody, the court heard testimony from the GAL that DCF had closed their investigation regarding the plaintiff's alleged sexual abuse of the children as unsubstantiated. Moreover, the GAL testified that, as of January 6, 2023, the Orange Police Department had closed its investigation.

After a careful review of the record, we conclude that the court's finding that the defendant made yet another false accusation of sexual abuse against the plaintiff was supported by abundant evidence in the record and, thus, was not clearly erroneous.

B

The defendant next contends that it was clearly erroneous for the court to reiterate, in its March 13, 2023 memorandum of decision, that she had ongoing struggles with substance abuse. We disagree.

In finding that the defendant had ongoing struggles with substance abuse, the court relied on the prior finding of substance abuse made in connection with the July 25, 2022 judgment. For the reasons set forth in part I A of this opinion, we decline to consider the propriety of the court's finding made in connection with the earlier judgment because the claim amounts to an

impermissible collateral challenge to the earlier judgment.

C

The defendant's final argument is that the court's custody rulings were contrary to the clear weight of the evidence. We disagree.

In a modification of custody, a court must satisfy two requirements. "First, modification of a custody award must be based upon either a material change [in] circumstances which alters the court's finding of the best interests of the child . . . or a finding that the custody order sought to be modified was not based upon the best interests of the child. . . . Second, the court shall consider the best interests of the child and in doing so may consider [the] several factors [set forth in § 46b-56 (c)]." (Internal quotation marks omitted.) *J. Y.* v. *M. R.*, supra, 215 Conn. App. 658.

In the present case, the court found that there had been a material change of circumstances since the initial custody order. The court found that "the [defendant's] condition has deteriorated dramatically" in ways that "ha[d] negatively impacted the children." In its July 25, 2022 judgment, the court found that various professionals had expressed concerns regarding the defendant's ability to address the children's emotional needs. The court found that those professionals "noted examples of the mother repeatedly taking a small, otherwise normal or not especially concerning behavior by the children . . . and misreading and creating a bigger, alarming meaning to that behavior." The court found that "[t]his tendency led the mother to claim that the [defendant] was molesting the children, taking pornographic pictures of the children, and using drugs when it turns out that none of these things were true. This tendency by the [defendant] is well documented and it is harmful for the children." The court ultimately found

that the defendant had "untreated mental health and substance abuse issues" and noted that "future modifications should take into account the court's observations about the needs of the [defendant] for additional treatment."

In its March 13, 2023 memorandum of decision, the court found that the defendant withheld the children from the plaintiff, which required police and court intervention, and further found that the defendant "initiated new investigations into the [plaintiff]. She accused him, again, of sexually abusing the children. As in the past, she withheld the children from [the plaintiff] and subjected them to interviews and invasive evaluations. [DCF] and the Orange Police Department were compelled to investigate this complaint, as they have on many prior occasions. They quickly closed their investigations, concluding that the complaint was unfounded."

Additionally, the court found that, although the defendant was participating in a drug treatment program, the plaintiff and the GAL were concerned that she may have relapsed. The defendant testified that "she is compliant with this program and the conditions of release set by the criminal court; however, she declined to give the GAL access to her drug testing records."

Moreover, the court noted in its memorandum of decision that the defendant's "presentation and demeanor in court was concerning." The court recounted that the defendant "appeared disassociated from the events taking place; her responses were inconsistent with the courtroom discussions. Her mood fluctuated throughout the hearing from disinterested to angry and agitated. At times it appeared she could not differentiate between her fears and actual events. At the outset of the hearing, she told the court that the ex parte orders should not be extended and that she had evidence to offer as a basis for that assertion. However, when the time came

to offer her evidence she initially refused. When she did testify it was inconsistent with testimony she offered previously . . . . Her explanations for refusing the GAL access to her drug tests and refusing to engage in a psychological evaluation were difficult to follow and unconvincing. The court could not rely on her testimony."

On the basis of the testimony of the plaintiff, the GAL, and the court's own observations, it concluded that the children's education was disrupted and that the stability of their day-to-day routine was upended. The latest DCF investigation had interrupted their relationship with the plaintiff for two weeks, and their relationship with the defendant remains interrupted because "she refuses to participate in evaluation, treatment or the current access schedule." In light of these findings and conclusions, the court modified the custody and access orders.

The court's factual findings, all of which find support in the record, support a determination that there was a material change in circumstances and that it was in the best interests of the parties' children to grant the motion for modification. Thus, the defendant has not proven that the court's ruling reflects an abuse of its discretion.

II

The defendant's next claim is that the court "displayed consistent bias" against her. We conclude that this claim is inadequately briefed.

"We repeatedly have stated that [w]e are not required to review issues that have been improperly presented to this court through an inadequate brief. . . . Analysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly. . . . [When] a claim is asserted in

the statement of issues but thereafter receives only cursory attention in the brief without substantive discussion or citation of authorities, it is deemed to be abandoned. . . . For a reviewing court to judiciously and efficiently . . . consider claims of error raised on appeal . . . the parties must clearly and fully set forth their arguments in their briefs. . . .

"In addition, briefing is inadequate when it is not only short, but confusing, repetitive, and disorganized. . . . We are mindful that [i]t is the established policy of the Connecticut courts to be solicitous of [self-represented] litigants and when it does not interfere with the rights of other parties to construe the rules of practice liberally in favor of the [self-represented] party. . . . Nonetheless, [a]lthough we allow [self-represented] litigants some latitude, the right of self-representation provides no attendant license not to comply with relevant rules of procedural and substantive law." (Internal quotation marks omitted.) *C. B.* v. *S. B.*, 211 Conn. App. 628, 630, 273 A.3d 271 (2022).

In the present case, the defendant maintains that Judge Grossman was biased against her and, therefore, the "judge was predisposed to rule against [her] regardless of what the evidence showed." As previously noted in this opinion, the defendant filed a motion to disqualify Judge Grossman, and that motion was referred to Judge Kenefick for a hearing. In its memorandum of decision dated January 3, 2023, the court noted that, with respect to the motion to disqualify Judge Grossman, "this court has carefully reviewed the defendant's memorandum in support thereof with its exhibits and does not find that Judge Grossman was in any way biased, [partial] or prejudiced against the defendant."

The court further noted that, in "the defendant's motion and memorandum of law, she accuses Judge Grossman of having 'an extreme prejudice and bias

against self-represented litigants.' I find no basis for that accusation in these proceedings. It would appear to be just the opposite. Judge Grossman went out of her way to show concern for this defendant." The court concluded: "There is no credible evidence that Judge Grossman's conduct toward the defendant could give rise to an appearance of impropriety. There is no evidence of bias, [partial] conduct or prejudice against the defendant." On that basis the court denied the motion.

The defendant, however, does not challenge the court's January 3, 2023 findings. The defendant makes only the following two references to her motion to disqualify Judge Grossman: "As shown above, [the defendant's] attempts to disqualify Judge Grossman were unsuccessful" and, "[a]s noted above, [the defendant's] motion to disqualify Judge Grossman for bias was denied." In her brief to this court, the defendant merely restates the claim of bias she made before the trial court. She does not provide any legal authority or analysis to support her claim on appeal.

Although we allow the defendant some latitude as a self-represented litigant, the sparsity and lack of substantive argument cause her brief to be "inadequate for us to conduct any meaningful review of" this claim. *C. B.* v. *S. B.*, supra, 211 Conn. App. 630–31 (declining to review claim when briefing was sparse, conclusory, disorganized, and confusing). Because the defendant has failed to challenge, in any meaningful way, the court's denial of her motion to disqualify, we decline to review this claim.

III

The defendant's final claim on appeal is that the court erred in finding that she had an imputed earning capacity. After careful review of the court's decision, we decline to reach the merits of this claim.

In its July 25, 2022 orders, the court found that the defendant had an imputed earning capacity of $90,000. The defendant attempted but failed to bring a successful appeal of the July 25, 2022 orders. See footnote 3 of this opinion. In its March 13, 2023 memorandum of decision granting the plaintiff's motion for modification, the court ordered that "[a]ll prior orders not specifically modified by these orders remain in effect." In that memorandum of decision, which is the subject of this appeal, the court did not revisit or alter its earlier finding with respect to the defendant's imputed earning capacity.[5]

The defendant's present attempt to challenge the court's finding with respect to her earning capacity, which was made in connection with its July 25, 2022 orders, amounts to an improper collateral attack on that earlier judgment that is not a proper subject of this appeal. For the foregoing reasons and on the basis of the authority set forth in part I A of this opinion, we decline to reach the merits of this claim.

The judgment is affirmed.

In this opinion the other judges concurred.

---

[5] We note that, on January 18, 2024, the court issued subsequent orders that superseded the July 25, 2022 order and required that the defendant pay the plaintiff $337 per week in child support. In connection with the January 18, 2024 order, the court similarly did not revisit or alter its earlier finding with respect to the defendant's imputed earning capacity.